

# NUMBER 13-22-00540-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

RUBEN PEREZ-MORALES,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

## On appeal from the 28th District Court
## of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria**
**Memorandum Opinion by Justice Longoria**

Appellant Ruben Perez-Morales was convicted of continuous sexual abuse of a young child, a first-degree felony, and sentenced to thirty-five years' imprisonment. *See* TEX. PENAL CODE ANN. § 21.02(b). In his sole issue on appeal, appellant challenges the sufficiency of the evidence to support his conviction. We affirm.

## I.    BACKGROUND

The State indicted appellant on one count of continuous sexual abuse of a young child, six counts of aggravated sexual assault, and two counts of indecency with a child. *See id.* §§ 21.02(b), 22.021(a)(2)(B), 21.11(d). As to the count of continuous sexual abuse of a young child, the State alleged that appellant:

> did then and there in Nueces County, Texas, during a period that was 30 days or more in duration, to-wit: from on or about February 4, 2021 through April 4, 2021, when [appellant] was 17 years of age or older, did commit two or more acts of sexual abuse against J.P.[1], a child younger than 14 years of age, and said acts having been violations of one or more of the following penal laws including:
>
> did then and there intentionally or knowingly cause the penetration of the mouth of J.P., a child who was then and there younger than 14 years of age and not the spouse of the defendant, by the defendant's sexual organ,
>
> AND/OR
>
> did then and there intentionally or knowingly cause the sexual organ of J.P., a child who was then and there younger than 14 years of age and not the spouse of the defendant, to contact the mouth of the defendant,
>
> AND/OR
>
> did then and there intentionally or knowingly cause the sexual organ of J.P., a child who was then and there younger than 14 years of age and not the spouse of the defendant, to contact the sexual organ of the defendant,
>
> AND/OR
>
> did then and there intentionally or knowingly cause the anus of J.P., a child who was then and there younger than 14 years of age and not the spouse of the defendant, to contact the sexual organ of the defendant,
>
> AND/OR

---

[1] To protect the identity of the minor child, we refer to her and her relatives by their initials. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process").

did then and there intentionally or knowingly cause the penetration of the anus of J.P., a child who was then and there younger than 14 years of age and not the spouse of the defendant, by defendant's hand/finger,

AND/OR

did then and there intentionally or knowingly cause the penetration of the female sexual organ of J.P., a child who was then and there younger than 14 years of age and not the spouse of the defendant, by defendant's hand/finger,

AND/OR

did then and there, with the intent to arouse or gratify the sexual desire of the defendant, engage in sexual contact with J.P., hereafter styled the complainant, by touching the anus of the complainant, a child younger than 17 years of age,

AND/OR

did then and there, with the intent to arouse or gratify the sexual desire of the defendant, engage in sexual contact with J.P., hereafter styled the complainant, by touching the genitals of the complainant, a child younger than 17 years of age[.]

## A. Trial

L.J. and appellant were married in September 2010 and separated in 2016. They have three children together, R.J, J.P., and A.J. J.P. was born October 7, 2012. After separating, they continued to live together as coparents for two to three years. L.J. was not employed during their marriage. At some point in 2016, L.J. took J.P. to the hospital because she believed she had seen something occur between appellant and J.P., but the hospital could not determine whether anything had happened. L.J. did not elaborate on the incident at trial. Subsequently, after L.J. had moved out with the children on her own, the children were able to visit with appellant. One evening, when L.J. was at work, the children were in L.J.'s mother's care. L.J.'s mother called her expressing concern

3

regarding J.P. making an outcry against appellant, and L.J. stated that she immediately picked J.P. up and brought her to the hospital. An examination was conducted, and J.P. was referred for a follow up examination with the child abuse resource and evaluation (CARE) team.

On cross-examination, L.J. stated that there was another man, a friend of L.J.'s that J.P. stated made her touch him sexually. L.J. could not be "sure" who the other man was, as J.P. did not identify him by name, though L.J. thought it could have been a friend of hers or someone she had dated.

At the time of trial, J.P. was ten years old. J.P. testified that she understood that no one was supposed to touch "her front part," "her back part," or her chest area without her permission, but that appellant had done so. She explained that appellant had touched her "front part and back part" with his "front part." Appellant also touched her with his tongue on her "front part." J.P. explained that the touching happened "more than four times" and it made her feel scared. She said that appellant would tell her not to tell anybody what had happened. She eventually told her grandmother what happened. She stated she decided to tell her grandmother what happened because she "didn't want to go with [appellant] anymore, because he was being rude to [her] dog." After she told her grandmother what happened, her mother took her to the hospital. J.P. admitted that she had been asked to lie about things in the past by her mother, but that she had not been asked to lie about what appellant did. She could not recall specific instances that her mother had asked her to lie, but did not dispute that her mother had asked her to lie regarding instances where her mother left her unattended. She explained that appellant

4

had touched her "with his front part" and they were not wearing clothes. She also said that "white stuff" came out of "his front part" and he would throw it to the floor.

N.J., J.P.'s maternal grandmother, testified as the outcry witness. She explained that she often babysat the children, and she would sometimes have appellant pick the children up to assist her and to have visits with his children. She recalled that in April 2021, prior to appellant picking up the children one day, she told the children it was time to get ready and J.P. began to cry, asking to stay with her instead. When N.J. asked J.P. why she did not want to go with appellant, J.P. told her that appellant had been touching her "in the front" and "in the back." N.J. said the information "shock[ed]" her and she called the Department of Child Protective Services (CPS) and her daughter. L.J. picked J.P. up and took her to the hospital, per CPS instructions. N.J. recalled that J.P. had told her that appellant touched her and that "she mentioned [] that he put his part to her back part. And that he was saying it wasn't gonna hurt."

N.J. also recalled that J.P. did not want to go with her father because he was mean to her dog. N.J. further testified that she had previously called CPS and the police several times for different reasons related to her daughter's care of the children, including once when L.J. left the children unattended at home while she went to work. In November 2020, CPS gave her temporary custody of the children while L.J. completed a service program to get her children back after leaving them home alone.

Esmerelda Ruby Garza, a forensic interviewer with the Children's Advocacy Center, testified that she interviewed J.P. in April of 2021. During her interview with J.P., J.P. informed her that there was one time that she was sitting with appellant on the couch

5

at home, when L.J. and appellant were still living together, and appellant had a blanket over J.P. and was touching her. L.J. walked in, saw what appellant was doing, and immediately took J.P. to the doctor. J.P. said that appellant made her remove her pants and underwear. J.P. stated that appellant would touch himself and J.P. gestured how he would do that, and then she said appellant would "touch[] her with the wet part." J.P. also recalled incidents where appellant would have her lay on the bed, and he would turn her around and "put[] it all the way in." When provided a diagram of the female body, she circled her "middle part" or vagina, and her "back part" or anus. J.P. said that it was painful and described the incidents, saying "that it sounded like two things hitting each other." J.P. stated that this happened twice.

CPS investigator Christian Escamilla testified that she was assigned to the case involving J.P.'s outcry against appellant. She interviewed L.J. and N.J. and she reviewed the forensic interview of J.P. She also spoke to the medical professionals. Because she does not speak Spanish, the meeting with appellant was conducted by her coworker and translated for her. When initially speaking to appellant to inform him of the safety plan that would be in place, the allegations against him were not specifically discussed, though he seemed aware of what the allegations were. A safety plan was put in place where he was not allowed to see the children during the investigation. Appellant informed the CPS investigators that he believed that the allegations were lies being made up by L.J. There was never a formal interview with appellant to discuss the specific allegations, though they attempted to interview him "several times." Ultimately, CPS determined there was "reason to believe" for sexual abuse against J.P., which means they determined it was

6

more likely than not that something happened. The determination was based on J.P.'s outcry and interview and her positive test for chlamydia, which CPS determined substantiated the allegations.

Officer Samantha Gonzales of the Corpus Christi Police Department (CCPD) was called out to N.J.'s house regarding an assault not in progress. She spoke with N.J. and learned that N.J.'s minor granddaughter was sexually assaulted. The case was then referred to CCPD Detective Mary Helen Leal with the crimes against children unit. Detective Leal was present for J.P.'s forensic interview. She described J.P. as "small" and "dainty." In regard to her demeanor, Detective Leal stated that J.P. was animated in her descriptions of the allegations against appellant. Detective Leal was surprised that an eight-year-old knew the terms she was using and by the way she was expressing herself, and she opined "[t]hat [J.P.] would [not] know what that was unless she actually saw it or it was done to her." In her interview of appellant, he denied the allegations against him. On cross-examination, Detective Leal stated she was unaware of any sexually transmitted disease testing done on appellant.

Juliann Denney, a sexual assault nurse examiner (SANE) with Driscoll Children's Hospital's CARE team, testified that J.P. was first brought in for parental concern of sexual assault at age three, but the examination yielded no findings indicative of sexual assault. J.P. was then brought in again at age eight. Denney read directly from J.P.'s record wherein J.P. stated, among other things, that appellant touched her on her female sexual organ "since she was little" and that appellant "kept putting his part," indicating his genitals, in her female sexual organ. According to the records, J.P. told the nurse that

there were times that appellant put "his part in all the way" and stated that it hurt. She said he put it in her front and back part, indicating her vagina and anus. She said appellant also put his fingers in her "front part and [her] back part" and that, when she "was little," appellant made her put "his front part in [her] mouth" which made her feel like she was going to throw up. She said clear stuff would come out "of his part." She also told the nurse that appellant would put his mouth on her "middle part." J.P. also stated that "mommy's friend only made me hold his front part like my daddy's one time."

Records indicated that J.P. was cooperative, active, a good historian, and maintained good eye contact during the examination. As to the physical examination, Denney noted no physical trauma to J.P.'s vagina or anus. She explained that it is not uncommon for there not to be any physical trauma in cases of sexual abuse. J.P. tested positive for chlamydia in her urine and rectum, for which she was treated.

Appellant testified in his own defense. He denied ever having inappropriately touched J.P. He stated that the only reason he could think of for why J.P. would make the allegations against him is because "her mom has been having problems." He testified that L.J. had been under investigation by CPS and was not completing the tasks under her service plan. He noted that the timing of the outcry coincided with the timeframe that L.J. was set to get her children back from N.J.'s temporary custody. He stated that there were times in the past that L.J. had instructed J.P. to lie, specifically detailing a time when L.J. told J.P. to lie about having been left alone in a vehicle by L.J. He also stated that he had never had chlamydia nor any symptoms of chlamydia. He had also never taken antibiotics.

8

Jesus Angel Morales, appellant's friend, testified that he has known appellant about thirteen years. He stated that he believed appellant to be a family man and a good father. He was testifying on appellant's behalf because he "kn[e]w he didn't do it."

The jury found appellant guilty on all charges. The State moved to dismiss counts two through nine, which was granted. The case proceeded to sentencing on the sole remaining count of continuous sexual abuse of a young child. Appellant was sentenced to a term of thirty-five years' incarceration. This appeal followed.

## II.    SUFFICIENCY OF THE EVIDENCE

By his sole issue on appeal, appellant challenges the sufficiency of the evidence against him, arguing it was insufficient to sustain a conviction for continuous sexual abuse of a young child.

### A.    Standard of Review

In evaluating a challenge to sufficiency of the evidence supporting a criminal conviction, we view the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences from it, whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011); *see also Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). The jury is the exclusive judge of the credibility of the witnesses and the weight to be given to the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Further, we defer to the jury's responsibility to fairly resolve conflicts in testimony, weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* This standard applies to both circumstantial and direct evidence. *Id.* We

9

do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993).

The determination of what weight to give testimonial evidence rests within the sole province of the jury because it turns on an evaluation of credibility and demeanor. *Davis v. State*, 177 S.W.3d 355, 359 (Tex. App.—Houston [1st Dist.] 2005, no pet.). The trier of fact may choose to believe or disbelieve any portion of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

We measure the sufficiency of the evidence by the elements of an offense as defined by a hypothetically correct jury charge. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021) "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

## B.      Discussion

A person commits the offense of "continuous sexual abuse of a young child," as applicable here, if: (1) during a period that is thirty or more days in duration, the person commits two or more acts of sexual abuse; and (2) at the time of the commission of each of the acts of sexual abuse, the actor is seventeen years of age or older and the victim is a child younger than fourteen years of age. TEX. PENAL CODE ANN. § 21.02(b); *see Turner v. State*, 573 S.W.3d 455, 462 (Tex. App.—Amarillo 2019, no pet.) (noting that "during a

10

period that is 30 or more days in duration" means "that the last act of sexual abuse occurred on or after the twenty-ninth day after the day the first act of sexual abuse occurred"); *Smith v. State*, 340 S.W.3d 41, 51 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (same). An "act of sexual abuse" is an act that violates one or more specified penal laws, including § 22.021, entitled "Aggravated Sexual Assault." *Id.* § 21.02(c)(4). A person commits the offense of aggravated sexual assault if the person intentionally or knowingly causes the penetration of the sexual organ of a child under the age of fourteen by any means. *See id.* §§ 22.021(a)(1)(B)(ii), (a)(2)(B). In this case, the indictment alleged that, from on or about February 4, 2021, through April 4, 2021, appellant committed at least two acts of sexual abuse against J.P., including an act constituting aggravated sexual assault. The indictment alleged that, during these acts, appellant was seventeen years of age or older and J.P. was a child younger than fourteen years of age.

While appellant concedes that a child victim's testimony alone is enough to prove a conviction for child sexual assault, he contends that there is evidence here that the child victim was not truthful and that "this Court should not follow Tex[as] Code [of] Crim[inal] Proc[edure] art[icle] 38.07 which provides that the uncorroborated testimony of a child is sufficient for conviction. This statute assumes that the child is not a liar or capable of lying."

Under Article 38.07 of the Texas Code of Criminal Procedure, when the victim is seventeen or younger, a conviction for a sexual offense "is supportable on the uncorroborated testimony of the victim of the sexual offense." TEX. CODE CRIM. PROC. ANN. art. 38.07(a), (b)(1). Here, J.P. testified to the abuse she endured from appellant.

11

She testified that appellant touched her "front part" and her "back part" with his "front part" and with his hands and tongue. Her testimony established that the abuse occurred more than once. Appellant asks us to discount J.P.'s testimony because she had admitted to having told lies in the past regarding other issues; however, we will not invade the province of the jury as it relates to issues of credibility. *See Isassi*, 330 S.W.3d at 638. We may not substitute our judgment for that of the factfinder. *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). And whatever appellant may think of J.P.'s testimony, the jury clearly found her credible. *See Hernandez v. State*, 610 S.W.3d 106, 111 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (noting that in a sufficiency review, "we presume that the jury credited the complainant's testimony"); *see also Moreno v. State*, No. 13-22-00267-CR, 2023 WL 4945083, at *3 (Tex. App.—Corpus Christi–Edinburg Aug. 3, 2023, no pet. h.).

Appellant also challenges the State's evidence to support the duration element of the charged offense. J.P. testified that the abuse occurred in the "old house" and at appellant's house. L.J. testified that the family lived together in the "old house" until sometime in 2018 or 2019. J.P.'s outcry to her grandmother happened in 2021 and J.P. testified that there was abuse occurring at that time when she would stay with appellant in his trailer, where he did not live until sometime after 2018, more than two years after the first incident of abuse. In cases of continuous sexual abuse, the trier of fact is entitled to "fit[] the pieces of the jigsaw puzzle together and weigh[] the credibility of each piece." *Flowers v. State*, 220 S.W.3d 919, 923 (Tex. Crim. App. 2007).

12

Deferring to the jury's determination of the credibility of the witnesses and the weight to be given their testimony, based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict, and considering the reasonable inferences to be drawn from that evidence, we conclude a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Appellant's sole issue is overruled.

### III.    CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
14th day of September, 2023.